UNITED STATES, Appellee,

v.

Pablo PANET–COLLAZO,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Ruben SANTANA–DIAZ a/k/a Raul,
Defendant, Appellant.

Nos. 91–1404, 91–1463.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1991.

Decided March 31, 1992.

Ramon Garcia, for Pablo Panet–Collazo.

Frederic Chardon Dubos, for Ruben Santana–Diaz.

Margaret A. Grove, with whom Harry J. Matz, Eumi L. Choi, Isaias Ortiz, Attys., Mary Lee Warren, Chief, Crim. Div., and Robert S. Mueller, III, Asst. Atty. Gen., were on brief, for appellee.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is a consolidated criminal appeal. Defendant-appellant Ruben Santana–Diaz (Santana–Diaz) appeals from his convictions for conspiracy to possess with intent to distribute cocaine and heroin and an attempt to possess with intent to distribute heroin. Defendant-appellant Pablo Panet

Collazo (Panet Collazo) challenges his sentence for the same conduct. Panet Collazo pled guilty. Santana–Diaz stood trial alone. We had previously issued an opinion in this case without the aid of the trial transcripts. We now write a new opinion with the benefit of the trial transcripts.[1] We affirm the conviction and sentence of Santana–Diaz and the sentence of Panet Collazo.

### Background

The Drug Enforcement Administration (DEA) in June of 1990 undertook an investigation of a narcotics distribution scheme operating out of Hilda's Restaurant in Carolina, Puerto Rico after receiving information from a confidential informant (CI). DEA Special Agent Thomas Geisel (Geisel) used the CI for introductions to members of the operation. The CI introduced Geisel to among others, Santana–Diaz, his brother Virginio Santana–Diaz, and Panet Collazo.

Geisel set in motion a "reverse sting" operation whereby he would purportedly supply heroin to the operation for distribution in Puerto Rico. In the course of the next several months Geisel spent time with the members of the organization to determine the scope of the drug operation. In one conversation, on June 13, 1990, Panet Collazo explained to Geisel that his organization could not move forward with a new drug deal because it had just received forty kilograms of cocaine and had eleven left to sell. In another conversation, Panet Collazo stated that his financial interests in horses and stables were just a way to launder money from the drug operation. Santana–Diaz explained, during one discussion with Geisel, that he, along with Panet Collazo, imported cocaine and heroin into Puerto Rico and then sold it in kilogram quantities.

The transaction that is the subject of this appeal was negotiated on September 29, 1990. At that time, Panet Collazo and Santana–Diaz agreed to enter into a joint venture with Geisel to purchase 5.6 kilograms of heroin from Geisel's purported Chinese supplier. They agreed to purchase the heroin in eight units of 700 grams each. The purchase price of each unit would be $90,-000. The three would then turn around and sell the units for $125,000 each, making a profit of $35,000 per unit. Five thousand dollars of the profit would be given to Panet Collazo's boss, while the remaining thirty thousand dollars would be split between Geisel and the two defendants. Geisel and Panet Collazo would each receive three-eighths, and Santana–Diaz would receive a quarter.

Geisel, on October 16, 1990, gave Panet Collazo and Santana–Diaz a heroin sample to test for quality. The next day the agent gave Santana–Diaz a second sample. Around this time the details of the transaction were finalized. The purchase was to be accomplished in half-hour intervals with one unit sold at a time. At this time Panet Collazo informed Geisel that he had arranged financing for all eight units.

Later that day, Francisco Rodriguez–Claudio and Gilberto Miranda–Lopez, the financiers for the purchase, arrived at the meeting place with enough money to buy one unit of the heroin. Also present were Geisel, Santana–Diaz, and Panet Collazo, who were to act as brokers for the deal. After the money was produced for the first purchase, they were all arrested.

### Ruben Santana–Diaz

The jury found Santana–Diaz guilty of conspiracy to possess with intent to distribute in excess of five kilograms of heroin and cocaine in violation of 21 U.S.C. § 841(a)(1) and § 846; and aiding and abetting an attempt to possess with intent to distribute 5.6 kilograms of heroin in violation of 21 U.S.C. § 841(a)(1), § 846 and 18 U.S.C. § 2.

At Santana–Diaz' sentencing hearing the court determined the applicable base of-

---

1. We inquired prior to writing the first opinion about the trial transcripts. We were informed that there were none. After the first opinion was published, which contained a number of references to the missing trial transcripts, San-

tana–Diaz' counsel located the trial transcripts in the district court clerk's office. He then moved that we reconsider the case in light of the trial transcripts and we agree to do so.

fense level to be 34, using 5.6 kilograms as the amount involved in the offense. U.S.S.G. § 2D1.1(c)(5) and § 2D1.4. Because of Santana–Diaz' role in the offense as a manager or supervisor, the trial court adjusted the base offense level upwards three levels, for a total of 37. U.S.S.G. § 3B1.1(b). Santana–Diaz was sentenced to 260 months imprisonment and five years of supervised release as to each count, to run concurrently.

Santana–Diaz raises six issues on appeal: (1) that the district court erred by failing to give a jury instruction on entrapment; (2) that the trial court erred in not dismissing the indictment based on the government's outrageous conduct; (3) that the trial court erred in not declaring a mistrial based on the government's improper remarks in its rebuttal closing argument; (4) that the trial court erred in sentencing by using 5.6 kilograms as the amount involved in the offense; (5) that the trial court erred in giving a three level increase to the base offense level for his role in the offense; and (6) that the trial court erred in sentencing him in the upper part of the guidelines.

### A. *Entrapment Instruction*

Santana–Diaz claims that he was entitled to a jury instruction on the theory of entrapment. He argues that there was enough evidence in the record to find both that the government induced him to commit the crime and that he lacked the predisposition otherwise to do so.

■■■ The defense of entrapment has two elements: (1) that the government induced the defendant's criminal conduct; and (2) that the defendant otherwise lacked the predisposition to engage in the criminal conduct. *United States v. Morales–Diaz,* 925 F.2d 535, 538 (1st Cir.1991); *United States v. Rodriguez,* 858 F.2d 809, 812 (1st Cir.1988). A defendant is entitled to an instruction as to his theory of entrapment if he produces some evidence to support fairly both elements. *Id.* at 814. This evidence, however, must be enough, if believed by a rational juror, to create a reasonable doubt that the defendant committed the crime of his own accord. *United*

*States v. Pratt,* 913 F.2d 982, 988 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). We review the failure of a trial judge to give a jury instruction on the theory of entrapment *de novo,* and we make that determination based on the legal sufficiency of the evidence. *United States v. McKenna,* 889 F.2d 1168, 1174 (1st Cir.1989); *Rodriguez,* 858 F.2d at 812.

■■■ After reading the trial record carefully we find that Santana–Diaz did not adequately demonstrate that he was not otherwise predisposed toward drug dealing. Santana–Diaz relies on evidence of his character and employment to demonstrate that he was not predisposed toward drug trafficking. For example, Santana–Diaz produced several character witnesses who testified to his hardworking, peaceful nature. The witnesses, however, were unaware of Santana–Diaz' activities outside the narrow context of his neighborhood and/or work activities. They had never been to Hilda's Restaurant, the establishment frequented by Santana–Diaz, and were ignorant of his activities there. Further, this court has noted that "[i]t cannot be enough ... where the defendant readily agreed to engage in a criminal act, to show that he enjoys a good reputation." *Kadis v. United States,* 373 F.2d 370, 374 (1st Cir.1967).

Further, Santana–Diaz testified that he became involved in drugs in large part because of his ambition to have a taxi to leave to his children and to otherwise improve his financial condition. We have held that "[e]ntrapment does not blossom whenever a person succumbs to his own greed or to the lure of easy money." *United States v. Coady,* 809 F.2d 119, 121 (1st Cir.1987). To the extent that Santana–Diaz presented evidence that he was lured by the easy money, he did not meet his burden that he lacked predisposition to commit the offense.

Finally, the government presented tapes of conversations which indicated Santana–Diaz' familiarity with the drug trade. In one conversation Santana–Diaz bragged that he had "seen the Chinese rock many

times" referring to heroin. In another conversation Santana–Diaz stated "that he had worked with cocaine a lot." In a third conversation with an undercover agent posing as a Chinese heroin supplier Santana–Diaz stated flat out: "You know the money anyway, yes this is my heart, hey this job, you know, it's my life, it's your life." In the face of the overwhelming evidence that Santana–Diaz had been previously involved in drug trafficking, and Santana–Diaz' own testimony that he was motivated in large part by greed, Santana–Diaz was not entitled to a jury instruction on entrapment.

### B. Government's "Outrageous Conduct"

■ Next, Santana–Diaz alleges, although it is somewhat unclear from his brief, that the trial court erred in not dismissing the case because of the government's outrageous conduct. Specifically, Santana–Diaz' objection stems from the testimony of Geisel during the trial. Geisel testified that the foolproof way to test the purity of heroin was to give it to a junkie. If the junkie died, then one would know that the heroin was pure. Santana–Diaz argues that, given this testimony, it was improper for the government to give samples of heroin to Santana–Diaz.

Viewing the comment in context, however, reveals that the government did not participate in any "outrageous conduct." Geisel testified that on "the street" heroin was tested as explained above. Geisel never testified that in fact he used this method. He was simply explaining why drug dealers provided samples—in order to test them. Geisel then stated that he tested heroin by giving it to the DEA lab, not to a junkie. Finding no outrageous conduct on the part of the government, we reject Santana–Diaz' claim.

### C. Prosecutorial Misconduct During Rebuttal Closing

■ Santana–Diaz challenges a comment made by the prosecutor during its rebuttal

closing argument. The prosecutor remarked:

> Let the Judge at the time of sentence take a look at all that and decide what is best for him, but give the Judge the opportunity; if you acquit this man, the Judge would never ever have an opportunity; let the Judge do what is better for him and better for us. Thank you.

Santana Diaz argues that this remark improperly suggested to the jury that the judge had already made up his mind that he was guilty.

During oral argument, defendant admitted that he did not contemporaneously object to the remark but rather, after the court had completed the jury instruction, requested a mistrial. In the absence of a contemporaneous objection we review only for plain error. *United States v. Moreno*, 947 F.2d 7, 8 (1st Cir.1991); *United States v. Mateos–Sanchez*, 864 F.2d 232, 240 (1st Cir.1988). We will only overturn a verdict if a comment " 'so poisoned the well' that the trial's outcome was likely affected." *Mateos–Sanchez*, 864 F.2d at 240–41 (quoting *United States v. Mejia–Lozano*, 829 F.2d 268, 274 (1st Cir.1987)).

We find no reason for a new trial in this case. Both parties agree that the comment was isolated. The district court, ruling on a motion for mistrial, found that any improper inference created by the remark was cured by its instructions. We find no reversible error.

### D. Amount Included in Offense

■ Santana–Diaz claims that the trial court improperly considered 5.6 kilograms of heroin in order to compute the base offense level under § 2D1.4 of the Sentencing Guidelines.[2] He points to Application Note One of § 2D1.4 of the sentencing guidelines, which states that "where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it

---

**2.** U.S.S.G. § 2D1.4 states that "[i]f a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed."

finds the defendant did not intend to produce and was not reasonably capable of producing." U.S.S.G. § 2D1.4, comment. (n.1). He argues that he should have only been sentenced for 700 grams, the amount purchased in the consummated transaction, because he was unable to produce enough money to purchase the entire 5.6 kilogram amount.[3]

■ We review a trial court's determination of the amount of drugs included in the offense for sentencing purposes under a clearly erroneous standard. *United States v. Cetina–Gomez*, 951 F.2d 432, 434–35 (1st Cir.1991). " 'And where more than one reasonable inference may be drawn from the undisputed facts, the court's choice from among supportable alternatives cannot be clearly erroneous.' " *United States v. Rodriguez Cortes*, 949 F.2d 532, 546–47 (1st Cir.1991) (citations omitted).

We find no error in the court's decision to use 5.6 kilograms as the amount of drugs involved in the offense for purposes of sentencing under the guidelines. Clearly, as negotiated, the deal was for 5.6 kilograms, not 700 grams. The district court found that though Santana–Diaz' organization may not have had the cash available to purchase the entire amount, it was engaged in financial negotiations to acquire the funding to purchase 5.6 kilograms. Therefore the district court did not commit clear error by finding that the object of the conspiracy was to obtain 5.6 kilograms and that the conspiracy was capable of obtaining financing to buy that amount.

### E. *Role in the Offense*

■ Santana–Diaz claims that the court erred in adjusting his base level upwards three levels for his role in the offense as a manager or supervisor of a criminal activity involving five or more participants. U.S.S.G. § 3B1.1(b). He contends that he lacked sufficient involvement to be classi-

fied as a manager or supervisor under the guidelines.

We review the trial court's determination of role in the offense only for clear error. *United States v. Osorio*, 929 F.2d 753, 764 (1st Cir.1991). The commentary to U.S.S.G. § 3B1.1 directs a court, in determining a defendant's role in the offense, to examine such factors as decision making authority, recruitment of accomplices, degree of participation in planning or organizing the offense, and degree of control over others. U.S.S.G. § 3B1.1, comment. (n.3).

The district court, at the sentencing hearing, found that although Santana–Diaz was clearly not the organizer, "he [was] the supervisor for Mr. Panet. He was involved in the transaction, he had certain authority to do and undo, get the people together in Caguas and he was ready to move and get other people from Mr. Panet so the whole transaction could be done...." This assessment of Santana–Diaz' role focused on the appropriate factors and is amply supported by the record. We find no error.

### F. *Vindictive Sentencing in Upper Part of the Range*

■ Santana–Diaz asserts that the trial court improperly sentenced him in the upper part of the applicable sentencing guidelines range. He points to the fact that his co-conspirator, Panet Collazo, who was found to have a larger role in the conspiracy, received a sentence in the middle of the range. Santana–Diaz contends that the trial court improperly treated the two differently because he chose to stand trial while Panet Collazo pled guilty.

We can only respond to this assertion by stating that we have no appellate jurisdiction to review a sentence within the applicable sentencing guidelines range if that range was correctly determined, as it was here. *United States v. Vega–Encarnacion*, 914 F.2d 20, 25 (1st Cir.1990), *cert.*

---

**3.** Santana–Diaz, also claimed, in a passing reference in his brief, that he was the victim of "entrapment" in regards to his sentence. It is the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are

deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 108 L.Ed.2d 944, 110 S.Ct. 1814 (1990). Because of the cursory presentation of the "sentencing entrapment" argument in Santana–Diaz' brief, we deem it waived.

*denied,* —— U.S. ——, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991).

## Pablo Panet Collazo

Pablo Panet Collazo pled guilty to intentionally and wilfully conspiring to possess with intent to distribute amounts of heroin and cocaine in excess of five kilograms, in violation of 21 U.S.C. § 841 and § 846; and aiding and abetting others in attempting to possess 5.6 kilograms of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

At the sentencing hearing the trial court determined that the applicable base offense level was 34, assuming 5.6 kilograms as the amount involved in the offense. U.S.S.G. § 2D1.1 and § 2D1.4. Citing Panet Collazo's leadership role, the court adjusted the base offense level upwards four levels. U.S.S.G. § 3B1.1(a). Finding that Panet Collazo had accepted responsibility for his crimes, the court adjusted the base offense level downwards two levels for a total base offense level of 36. U.S.S.G. § 3E1.1. He was sentenced to a term of 220 months for each count, to run concurrently. Panet Collazo was fined $10,000 and given a supervised release of five years for each count, also to run concurrently.

Panet Collazo raises two issues on appeal: (1) that the district court erred in considering the total amount of heroin, 5.6 kilograms, instead of the 700 grams actually purchased to compute the base offense, and (2) that the district court erred in considering the appellant as an organizer and/or leader of a criminal activity involving five or more participants under U.S.S.G. § 3B1.1(a).

### A. *Amount of Heroin for Sentencing Purposes*

 Panet–Collazo argues that the conspiracy did not have the money necessary to buy 5.6 kilograms having only enough for 700 grams. Alternatively, he contends that the government entrapped him into committing an offense greater than he would otherwise be predisposed to commit. Therefore, he argues that he should only be sentenced for the amount he intended to buy, 700 grams.

We review a trial court's determinations under the Sentencing Guidelines only for clear error. *United States v. Sklar,* 920 F.2d 107, 110–11 (1st Cir.1990). We find no such error here. Panet Collazo pled guilty to a conspiracy to buy 5.6 kilograms of heroin, not 700 grams. At the plea colloquy Panet Collazo made no objection to the amount involved in the conspiracy. As the Supreme Court stated in *United States v. Broce,* 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989): "A guilty plea 'is more than a confession which admits that the accused did various acts.' It is 'an admission that he committed the crime charged against him.'" *Id.* at 570, 109 S.Ct. at 762 (citations omitted). Here, Panet Collazo admitted, by pleading guilty, that he conspired to possess with the intent to distribute 5.6 kilograms.

Even aside from Panet Collazo's guilty plea, we find his argument to have little merit. As already discussed, there was sufficient evidence for the district court to have found that the conspiracy intended to purchase the entire 5.6 kilograms and that it was capable of producing enough funds to do so. As a member of the conspiracy, Panet Collazo was chargeable with its object amount.

Finally, as to Panet Collazo's allegation of sentencing entrapment, we need not decide today whether there is such a doctrine. We find no indication in the record that Panet Collazo was not predisposed toward acquiring the entire 5.6 kilograms. To the contrary, Panet Collazo had bragged to Geisel on several occasions of the extent of his illegal drug activities. There was no clear error.

### B. *Role in the Offense*

 Panet Collazo claims that the trial court erred in adjusting his sentence upwards four levels for his role in the offense as "an organizer or leader of a criminal activity that involved five or more participants...." U.S.S.G. § 3B1.1(a). He argues that he only had direct control over two individuals, Santana Diaz and his brother Virginio. Panet Collazo contends that others, including Rodriguez–Claudio

and Miranda–Lopez, were improperly counted as individuals under his control. These individuals, he asserts, were buyers from his organization, and as such he had no control over their actions.

We review a trial court's findings of fact under the Sentencing Guidelines only for clear error. *United States v. Preakos,* 907 F.2d 7, 8 (1st Cir.1990). In determining whether a defendant was an organizer or leader, the trial court should consider:

> the [defendant's] exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n.3). *See also Preakos,* 907 F.2d at 9.

We find that the trial court did not err in adjusting Panet Collazo's sentence upwards four levels. The trial court could have reasonably found that Panet Collazo had control over five individuals, not two, as he argues. Panet Collazo pled guilty to a conspiracy which included four other members.[4] These four members included Rodriguez–Claudio and Miranda–Lopez. The district court had a solid basis for finding that Panet Collazo actually had control over these two individuals. The evidence presented included Geisel's testimony that Rodriguez–Claudio and Miranda–Lopez were Panet Collazo's "money men." As to Santana–Diaz and his brother Virginio, Panet Collazo conceded that he had control over them. Finally, this court has held that the defendant may be included as a participant for purposes of § 3B1.1. *Preakos,* 907 F.2d at 10. Thus, the district could have reasonably found that Panet Collazo had control over five members including himself and therefore was properly subject to a four-level upward adjustment in his sentence.

Conclusion

We affirm the conviction and sentence of Santana–Diaz. We affirm the sentence of Panet Collazo.

---

4. These individuals included Ruben Santana–Diaz, Virginio Santana–Diaz, Gilberto Miranda– Lopez, and Francisco Rodriguez–Claudio.