**UNITED STATES, Appellee,**

v.

**Joseph S. BENEVIDES, Defendant, Appellant.**

**No. 92–1737.**

United States Court of Appeals, First Circuit.

Heard Dec. 11, 1992.

Decided Feb. 11, 1993.

---

**3.** Paraquat is one of the ingredients in Gramaxone, the pesticide manufactured by defendant, ICI Americas, Inc.

Randy Olen with whom John M. Cicilline was on brief, for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lawrence D. Gaynor, Asst. U.S. Atty. and Lincoln C. Almond, U.S. Atty., were on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

At his jury trial, defendant Joseph S. Benevides was convicted of conspiracy to transfer a firearm illegally. On appeal, defendant challenges the sufficiency of the evidence supporting his conviction. Finding sufficient evidence to sustain the conviction, we affirm.

## I.

## BACKGROUND

We summarize the evidence in a light most favorable to the government. *United States v. Nueva*, 979 F.2d 880, 881 (1st Cir.1992). Defendant was employed at Handy and Harmon Jewelry Company ("Handy and Harmon") in East Providence, Rhode Island. On May 15, 1991, Officer Genaro Ramirez of the East Providence Police Department began undercover work as an employee of Handy and Harmon. Although his original assignment was to investigate complaints of gold theft from the company, Ramirez began investigating other possible criminal activity as well. As part of his investigation, Ramirez told Yee Yang, another employee of Handy and Harmon, that he was interested in purchasing a gun for his own protection. Soon

thereafter, defendant approached Ramirez at work and told him that he had a friend who could supply Ramirez with guns. Defendant mentioned specifically that his friend had a "beautiful" sawed-off shotgun that defendant himself had considered purchasing. Ramirez expressed interest.

On June 27, 1991, defendant advised Ramirez that he had made arrangements for Ramirez to meet his friend after work. Ramirez was reluctant to meet defendant's friend that day because he had advised neither his supervisors nor federal officers from the Bureau of Alcohol, Tobacco and Firearms of the meeting. Defendant was very persistent, however, and for the sake of the investigation, Ramirez felt he had no choice but to go. Defendant and Ramirez drove in separate cars to a liquor store parking lot where defendant had arranged to meet his friend, Hans Lunder ("Smitty").

Smitty, accompanied by his wife, arrived at the parking lot in a black van. Defendant introduced Ramirez to Smitty and his wife. After introductions, defendant asked "Why don't you guys get to business[?]" In the presence of defendant, Ramirez told Smitty that he had no money with him, but that he was interested in purchasing the sawed-off shotgun. In the course of the conversation, defendant asked Smitty if Smitty had the shotgun with him. Smitty replied that he did. Smitty mentioned that he could also provide Ramirez with a .357 handgun, although he did not have it with him.

Ramirez then asked to see the shotgun. Smitty disappeared momentarily and returned. With defendant still present, Smitty told Ramirez to proceed to a white car that was parked about twenty-five feet away in the parking lot, to get into the passenger side, and to "make it look cool because of the cops."

Ramirez proceeded to the car alone, leaving defendant with Smitty and his wife. Upon getting in the car, Ramirez met William Dawson. Dawson showed Ramirez a sawed-off shotgun, and assured him that it functioned. Dawson and Ramirez agreed on a price of $200 for the gun. Ramirez told Dawson that he had no money, but

that when he was ready to purchase the gun, he would let Dawson know through defendant.

Ramirez then returned without the gun to Smitty's van. With defendant still present, Ramirez told Smitty that he would let Smitty know, through defendant, when he had enough money to buy the sawed-off shotgun.

Less than one month later, on July 22, 1991, defendant approached Ramirez and asked him if he was still interested in buying the sawed-off shotgun or the .357 handgun that Smitty had mentioned. When Ramirez replied in the affirmative, defendant said that he would make the necessary arrangements for the purchases by telephoning Smitty.

Two days later, on July 24, defendant approached Ramirez at work and told him that the deal had been set for the following day. The next day, July 25, defendant advised Ramirez that the deal was set for later that day, but that defendant would have to contact Smitty to make sure of the time and place of the meeting. That afternoon, defendant approached Ramirez to tell him that he had spoken with Smitty and that Smitty had arranged a meeting for that afternoon at the same liquor store parking lot where the parties had previously met. Defendant stated that he would not be present because he had to buy parts for his truck. Defendant said that Smitty would not be present either, but that Dawson would arrive with both the shotgun and the .357 handgun.

Ramirez arrived alone at the parking lot at the appointed time and found Dawson standing outside of a minivan. Dawson told Ramirez that he had the sawed-off shotgun which Ramirez had previously seen, and that another person, located across the street from where Dawson and Ramirez were standing, had the .357 handgun which Ramirez could purchase.

Ramirez began haggling with Dawson about the price of the shotgun. Dawson said that he could go no lower than $170 because Smitty was getting $50 of the purchase price. When asked whether defendant was receiving any portion of the mon-

ey, Dawson replied that he was not. Ramirez purchased the gun from Dawson for $170.

After placing the shotgun in the trunk of his car, Ramirez returned to Dawson's minivan and inquired about the .357 handgun. Dawson directed Ramirez across the street, where Ramirez met a man named "Bill" who showed him the .357 handgun. Ramirez and Bill negotiated a price of $450 for the .357 handgun. Subsequently, Bill departed the scene, and though Ramirez expected his return, Bill never reappeared. Ramirez left without purchasing the handgun.

The following day at work, defendant asked Ramirez if he had purchased a gun, and Ramirez replied that he had purchased the shotgun. Five days later, on July 31, Ramirez told defendant that he had sold the shotgun for a profit. On August 1, Ramirez told defendant he was still interested in the .357 handgun. From a telephone at work, defendant called Smitty, and handed the phone to Ramirez. Smitty apologized to Ramirez for the disappearance of Bill, and asked if Ramirez was satisfied with his purchase of the shotgun.

On August 9, 1991, defendant again called Smitty from work, and again handed the phone to Ramirez. Ramirez asked about the .357 handgun, and Smitty told him that Bill had gone to Florida, and that he could not get the handgun until a later date. That day, defendant gave Smitty's phone number to Ramirez.

On October 17, 1991, defendant was arrested. The indictment against defendant charged him with conspiracy to transfer a firearm in violation of 26 U.S.C. §§ 5861(e) [1], 5811 [2], and 5812(a) [3] of the National Firearms Act ("the Act"), all in violation of 18 U.S.C. § 371.[4]

At trial, the government's evidence showed that the gun which Ramirez purchased from Dawson was a firearm within the meaning of 26 U.S.C. § 5845(a)(2),[5] that it was unregistered, and that it was transferred without the required application to transfer and without payment of the required transfer tax.

## II.

## DISCUSSION

Defendant challenges the sufficiency of the evidence supporting his conviction.

---

**1.** 26 U.S.C. § 5861(e) makes it unlawful for any person to "transfer a firearm in violation of the provisions of this chapter."

**2.** 26 U.S.C. § 5811 provides in relevant part:
(a) **Rate.** There shall be levied, collected, and paid on firearms transferred a tax at the rate of $200 for each firearm transferred.... (b) **By whom paid.** The tax imposed by subsection (a) of this section shall be paid by the transferor.

**3.** *26 U.S.C. § 5812(a) provides:*
A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary [of the Treasury] a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application

form in such manner as the Secretary may by regulations prescribe; and (6) the application form shows that the Secretary has approved the transfer and the registration of the firearm to the transferee. *Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of the law.*

**4.** 18 U.S.C. § 371 provides in relevant part:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**5.** 26 U.S.C. § 5845(a)(2) provides:
The term "firearm" means a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length.
The weapon which was transferred was a modified shotgun with an overall length of twenty one and one-half inches, and a barrel length of twelve and one-half inches.

More specifically, defendant argues (1) that there was insufficient evidence that he entered into an agreement to commit the unlawful act,[6] and (2) that he was indifferent to the outcome of the conspiracy.

In reviewing a claim of insufficient evidence, we view the evidence in the light most favorable to the verdict, and determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. *United States v. Tejeda*, 974 F.2d 210, 212 (1st Cir.1992).

"The 'essence' of conspiracy is an *agreement* to commit a crime." *United States v. Moran*, 984 F.2d 1299, 1300 (1st Cir.1993) (emphasis in original). Thus, a sustainable conspiracy conviction requires "proof beyond a reasonable doubt that the conspirators intended to agree and to commit whatever substantive criminal offense may have been the object of their unlawful agreement." *United States v. Cruz*, 981 F.2d 613, 616 (1st Cir.1992). The unlawful agreement may be either express or tacit. *Tejeda*, 974 F.2d at 212. Its existence may be proven by direct or circumstantial evidence. *Id.* Moreover, the government is not required to prove that the defendant knew about, or took part in, all aspects of the conspiracy. *Cruz*, at 618; *United States v. Rivera–Santiago*, 872 F.2d 1073,

1079 (1st Cir.), *cert. denied*, 492 U.S. 910, 493 U.S. 832, 109 S.Ct. 3227, 110 S.Ct. 105, 106 L.Ed.2d 576, 107 L.Ed.2d 68 (1989). All that is required is that the government show " 'the essential nature of the plan and the [defendant's] connection with it.' " *Id.* (quoting *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947)). The record before us discloses ample evidence to support defendant's conviction of conspiring to transfer a firearm illegally.

The government's evidence showed that defendant approached Ramirez and told him about a friend who could supply guns, that defendant arranged the first meeting in the parking lot, that he persisted in bringing Ramirez to the first meeting, that he arrived at the first meeting and asked Smitty whether Smitty had brought the shotgun, that he remained in the parking lot with Smitty throughout the first meeting, that he approached Ramirez about the second meeting, that he arranged the second meeting when the gun was transferred, and that he continued to phone Smitty after the transfer. In our view, such evidence is more than sufficient for a reasonable jury to have inferred an agreement between Smitty and defendant to transfer the gun to Ramirez.[7] According-

---

6. In that part of his brief which argues that there was insufficient evidence of an agreement, defendant also asserts that the government's evidence failed to show that he "had the necessary intent to commit the substantive offense." To the extent that this statement is an attempt to raise an issue other than the sufficiency of the evidence, it is plainly inadequate to warrant our review. We have repeatedly warned parties that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). Accordingly, we decline to engage in speculation or to forge beyond the line of argument that defendant has explicitly pursued in his appeal.

7. In his motion to the district court for judgment of acquittal, and again on appeal, defendant has relied on *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir.1985), to argue that he merely helped a willing buyer locate a willing seller. As the district court properly noted in denying defendant's motion, however, *Tyler* differs significantly from the case before us.

In *Tyler*, the defendant met an undercover police officer who expressed an interest in purchasing drugs. Defendant Tyler then approached drug dealers in the street on behalf of the officer. Eschewing the first dealer he met, Tyler arranged for the officer to purchase heroin from a second dealer. There was no evidence that Tyler knew either seller. Finding that "[t]he evidence adduced by the government merely shows that Tyler helped a willing buyer locate a willing seller," *id.* at 69, the Second Circuit reversed Tyler's conspiracy conviction, reasoning that "such evidence, *standing alone*, is insufficient to establish the existence of an agreement between [Tyler] and the seller." *Id.* (emphasis supplied).

In the instant case, the government's evidence shows that defendant approached Ramirez at work on several occasions regarding the transfer, that he placed several phone calls, arranged two meetings, and attended the first meeting. Therefore, unlike the spontaneous sale in *Tyler*, which provided no evidence of an agreement between Tyler and the seller, the record before us presents ample evidence from which the jury

ly, we find defendant's sufficiency argument unpersuasive.

 Defendant's second argument suffers a similar fate. A conspiracy conviction will not be sustained if the government's evidence shows that a defendant "was indifferent to the [conspiracy's] outcome altogether." *United States v. Aponte–Suarez*, 905 F.2d 483, 491 (1st Cir. 1990), *cert. denied*, 498 U.S. 990, 111 S.Ct. 531, 112 L.Ed.2d 541 (1990), — U.S. —, 111 S.Ct. 975, 112 L.Ed.2d 1061 (1991). Instead, "[a]n accused must 'in some sense promote [the conspiracy] himself, make it his own, have a stake in its outcome.'" *Id.* (quoting *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940)). In the case at bar, there was evidence that defendant approached Ramirez on numerous occasions, planned meetings, persisted in bringing them about, and asked about the transfer after it occurred. Far from showing indifference, this evidence tends to indicate that defendant actively promoted the transfer which underlies his conviction. Accordingly, we reject defendant's contention that a reasonable jury only could have found that he was indifferent to the outcome of the conspiracy.[8]

### III.

### CONCLUSION

For the foregoing reasons, defendant's conviction is affirmed. *Affirmed.*

could have found an agreement between defendant and Smitty to transfer the shotgun.

Defendant further argues that the district court, in reaching its decision that *Tyler* did not apply, unduly relied on the government's assertion that defendant "initiated" discussions about the gun. Our review of the record, however, shows that the district court did not limit itself to evidence regarding the initiation of the sale. Instead, the district court properly considered all of the evidence of an agreement, including defendant's phone calls, his arrangement of the meetings and his later conversations with Ramirez about the transfer, when it denied defendant's motion for judgment of acquittal based on *Tyler*.

8. In arguing that he was indifferent to the conspiracy's outcome, defendant relies almost exclusively on the fact that he received no money for the transfer. However, a defendant "may be guilty of participation in a criminal conspiracy without actually profiting from or having any financial stake in it." *United States v. Alemany Rivera*, 781 F.2d 229, 237 n. 9 (1st Cir.1985), *cert. denied*, 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986). *See also Aponte–Suarez*, 905 F.2d at 491. Simply put, in the face of the aforementioned evidence, we do not find defendant's lack of a financial stake in the sale of the shotgun to be a sufficient basis for overturning the jury's verdict.