8 F.3d 809
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES of America, Appellee,
v.
John Antonio CASILLAS, Plaintiff, Appellant.
UNITED STATES of America, Appellee,
v.
JOSE E. BONILLA-MARTINEZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
FERNANDO FACIO-LABOY, Defendant, Appellant.
 Nos. 91-2298, 92-1493, 92-1494.
 United States Court of Appeals,
First Circuit.
 October 28, 1993
 
 Appeals From The United States District Court For the District of Puerto Rico
 Manfredo E. Lespier-Garcia for appellant John Antonio Casillas.
 David Rive-Rivera, by Appointment of the Court, for appellant Fernando Faccio-Laboy.
 Carlos R. Noriega, by Appointment of the Court, for appellant Jose E. Bonilla-Martinez.
 Rosa Emilia Rodriguez-Velez, Assistant U.S. Attorney, with whom Charles E. Fitzwilliam, United States Attorney, and Jose A. Quiles-Espinosa, Senior Litigation Counsel, were on brief for appellee.
 D.Puerto Rico
 AFFIRMED
 Before Selya, Circuit Judge, Aldrich and Coffin, Senior Circuit Judges.
 COFFIN, Senior Circuit Judge.
 
 
 1
 These three appeals are brought by defendants Jose Antonio Casillas (Casillas), Jose Enrique Bonilla Martinez (Bonilla), and Fernando Faccio-Laboy (Faccio), who were adjudged guilty of conspiracy to possess with intent to distribute multi-kilo quantities of cocaine, in violation of 21 U.S.C. § 846. One defendant, Casillas, was convicted of using a telephone in facilitating the conspiracy, in violation of 21 U.S.C. § 843(b). In addition to terms of supervised release and special monetary assessments, the following terms of imprisonment were imposed: Casillas, 292 months; Bonilla, 264 months; Faccio, 264 months.
 
 
 2
 Appellants Casillas and Bonilla challenge the sufficiency of the evidence to support their convictions. Appellant Casillas also challenges the district court's finding, pursuant to Sentencing Guideline § 3B1.1, U.S.S.G. § 3B1.1, that his role was that of manager/supervisor of the conspiracy, and its consequent increasing of his offense level. Each appellant challenges the court's finding that he was instrumental in negotiating for the purchase of 150 kilograms of cocaine, a finding resulting in a base offense level of 38. More particularly, each appellant claims that he had neither the intent nor the capacity to bring about the purchase of such a large quantity of cocaine.
 
 
 3
 After reviewing the record of events and the evidence of appellants' intent and capacity, we affirm as to all issues.
 
 The reverse drug buy undercover operation
 
 4
 We set forth what we consider a sufficient narration of events, as the jury was warranted in viewing them, to make our discussion of the legal issues comprehensible. We have necessarily excluded much and selected from not always consistent testimony.
 
 
 5
 The conspiracy originated with the government. This was a "reverse sting" operation, in which government undercover agents posed as sellers and set up deals with would-be drug buyers. Drug Enforcement Administration (DEA) special agent Jefferson Justice worked with and often through a confidential informant, William Hoercherl, to involve appellant Casillas in a drug importing scheme. Casillas had participated with Hoercherl in a prior deal, involving some 102 kilograms, and was thought to be a suitable target for DEA activity. Contacts began in May, 1990, and by June had progressed to the point where Casillas agreed to be a broker for Hoercherl and Justice (now posing as Hoercherl's nephew) in the importation and sale of 600 kilograms of cocaine. New York and Miami were to be the locus for the sale of 400 kilograms and Puerto Rico the locus for 200 kilos. The price for a kilo was $12,500. Casillas was to find the customers.
 
 
 6
 During July there was continual activity: Casillas brought into the venture one Torres, who was expected to find buyers in New York and Miami; a sampling of cocaine was done at the Caribe Hilton Hotel, but Casillas canceled a scheduled transaction because his buyers distrusted the location; and the terms changed, the amount of down payment required by the "sellers" having dropped from $1,000,000 for 200 kilos to $400,000.
 
 
 7
 In early August, Torres introduced one Ortiz, who was to come forward with property as collateral for part of the down payment. On August 8, Ortiz attended a meeting with Justice, Casillas, and others, and gave Justice documents concerning four pieces of real estate: a four-unit apartment building, Ortiz's residence, an urban lot in Dorado Del Mar, and a rural lot. Casillas had received from Ortiz documents of title to eleven automobiles; these he gave to Justice. Then Ortiz signed a note giving Justice all of the collateral "if the money for services [i.e., drugs delivered] is not paid in full." Ortiz also claimed to have nineteen other vehicles on his lot and thirty-four en route via barge. This satisfied the first half of the required down payment of $400,000. Casillas, however, failed to come up with the second half of the down payment in cash on that day.
 
 
 8
 Two days later, on August 10, Casillas introduced appellant Faccio to Hoercherl as the person who would provide the money for the additional down payment. The amount of drugs to be delivered had dropped from 200 kilos to 150 kilos. Hoercherl discussed the transaction, which would require a down payment of $400,000 (one half of which was the Ortiz collateral), and would buy 50 kilos of cocaine, 25 of which would be delivered at once, the remainder to be delivered on consignment. Presumably this meant that the seller would retain title until payment was accomplished. The remaining 100 kilos were to be delivered later in the day. Not part of Hoercherl's discussion but elsewhere revealed in the testimony was the understanding that Casillas would be charged with ensuring that the sales proceeds would be collected and paid to the sellers. In other words, delivery of the 100 kilos was not conditioned on a down payment.
 
 
 9
 A meeting took place on August 13, which was attended by Hoercherl, Justice, Faccio, and Casillas. While the August 10 meeting was not recorded on tape, this one was. Although Hoercherl testified that on August 13 there was discussion of arrangements to deliver the 150 kilos on August 15, the tape contains no reference to this total amount. Faccio, who spoke only Spanish and to whom the remarks of Justice and Hoercherl had to be translated by Casillas, was recorded as mentioning "the 25" and being told by Casillas that "those 25 are gonna leave you with 25 more" and that "It will pay off for you." It was agreed that the transaction not take place until August 15 in Faccio's Feria Court Apartments building. Faccio preferred that date to the 14th "Because that way you give me all day today to get a hold of Quique." Quique was elsewhere identified as appellant Bonilla. However, on August 15, Casillas spoke with Justice and Hoercherl and postponed the meeting until the following day, as he needed more time to secure the money for the deal.
 
 
 10
 On August 16, Justice and Hoercherl came to Faccio's apartment building. At 4:30, Bonilla drove up in a white Ford Bronco, talked with Casillas, and entered the building. Bonilla came back to the Bronco at 4:45, reentered the building, came out again at 4:55, went to the Bronco, took out a white box and reentered the building. Faccio and Bonilla talked in front of the building, then Bonilla made a third trip to the Bronco, bringing back a blue money pouch. He was then seen shortly after at a fifth story window. He and another person (an acquitted co-defendant) were seen talking together at apartment 203; Bonilla was nervous about this location, because of some adjacent occupant. He then talked to Faccio, who told him that the money would be in apartment 305. Faccio went to the elevator, and pushed the button; the door opened, revealing Bonilla and an associate with both the white box and the blue pouch. Hoercherl subsequently saw the white box and the blue pouch in apartment 305, both with money in them. When he asked Casillas if the $200,000 were all there, Casillas replied that it was "a little short." Casillas then said that Bonilla and his associate must inspect the delivered drug cargo, for it was "their money."
 
 
 11
 Casillas exited the building, carrying the white box, and went to his Volvo, outside the gate to the apartment complex. At this juncture, Justice, who was waiting outside the gate, gave Hoercherl the keys to the car which supposedly was carrying the cocaine. Hoercherl walked toward it, meanwhile telling other government agents what to expect inside the gate. He then drove to the gate, followed by federal agents in a van, entered, and the arrest of the appellants followed. The white box in Casillas's Volvo contained $97,950. Bonilla threw away the key to the pouch, which was now empty. Keys to apartment 305 were found on him. Faccio possessed a box containing many keys to apartments, including number 305.
 
 
 12
 A Preliminary Inquiry Entrapment?
 
 
 13
 Appellant Casillas has devoted a substantial part of his brief to asserting that this prosecution was the kind of situation described in Sorrells v. United States, 287 U.S. 435, 442 (1932), "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Appellant cites as support the governmental origin of the scheme, the use and instruction of an informant, the uninvited visits to Casillas, the initiation of telephone calls by the informant or the undercover agent, and the absence of cocaine.
 
 
 14
 But entrapment (a word which does not appear in Casillas's brief) is not an issue in this case. Appellant requested, and the district court refused, an instruction on entrapment. Appellant has not identified this ruling as error or made it an issue. He cannot now slide it into the case. Nor can appellant gain any comfort from the safety valve of "plain error"-which in any event he has not invoked. The evidence of predisposition was manifest. See generally United States v. Panet-Collazo, 960 F.2d 256, 259-60 (1st Cir. 1992). And this is not that rare case where we might characterize the government's conduct as outrageous. As we have noted in United States v. Rafael Santana and Francis Fuentes, No. 90-1393, slip op. at 6 (1st Cir. Sept. 16, 1993), "The banner of outrageous misconduct is often raised but seldom saluted."
 
 Sufficiency
 
 15
 Both Casillas and Bonilla challenge the sufficiency of the evidence to support their convictions for conspiracy. Our standard of review is limited. We indulge all reasonable inferences favoring the prosecution. Our query is whether a rational jury could have found guilt beyond a reasonable doubt. United States v. Benevides, 985 F.2d 629, 633 (1st Cir. 1993). So long as the government has shown by direct or circumstantial evidence that a defendant intended to agree and to commit whatever substantive criminal offense may have been the target of the conspirators' agreement, it has met its obligations. United States v. Cruz, 981 F.2d 613, 616 (1st Cir. 1992). It does not need to show that a defendant took part in all aspects of the conspiracy. Id., at 617; Benevides, 985 F.2d at 633 (proof of the essential nature of the plan, and defendant's connection with it is enough) (quoting Blumenthal v. United States, 332 U.S. 539 (1947)).
 
 
 16
 The record, insofar as it concerns Casillas, is voluminous. He participated in all the meetings, conducted negotiations, and sought buyers, recruiting Torres who brought in Ortiz, and Faccio, who brought in Bonilla. He inspected samples, called off or delayed meetings, and decided when a transaction was ready. He was the spokesman of the buyer group and was the person who placed the money in his car for exchange on delivery of the cocaine. The evidence of his participation was more than sufficient.
 
 
 17
 Bonilla's main argument is that he had not appeared at any of the many meetings at which the drug deal was discussed, and that his presence on August 16 at the Feria Court Apartments (the scene of the drug transaction) was innocent, as he was there to negotiate the purchase of an apartment, not drugs. But that day was crucial to the conspiracy, and Bonilla proved to be a most active and visible actor. In the first place, a defendant's "mere presence" claim is more difficult to sustain when his "presence" was at the scene of the transaction. See United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) ("Jurors can be assumed to know that criminals rarely welcome innocent persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences."). In the second place, Faccio's expressed satisfaction that postponement of the transaction would give him a day to "get a hold of Quique" (identified as Bonilla) could be taken by the jury to indicate the essentiality of his role. In the third place, the events of August 16 reveal his omnipresence: his several trips to the Bronco; his nervousness at having the transaction in apartment 203 and his apparent influence in changing to apartment 305; his appearance in the elevator with the white box and the blue money pouch; Casillas's statement that Bonilla and his associate should inspect the drugs being delivered, for it was "their money;" his attempt to throw away the key to the pouch; and his possession of the key to apartment 305, the money room.
 
 
 18
 The jury, of course, was entitled to disbelieve his proffered alibi that he was there to inspect an apartment that he and his wife might decide to buy. Moreover, the jury was entitled to draw the inference that Bonilla would not likely have brought almost a hundred thousand dollars to the transaction if he had not known of the total down payment requirement, the extent of Ortiz's contribution of collateral, and the understanding as to the remaining delivery. In short, the evidence was sufficient to support the verdict.
 
 Sentencing Issues
 
 19
 Manager/Supervisor. Appellant Casillas devotes two sentences in his brief to the claim that the district court erred in increasing his offense level because of his role as manager or supervisor of the conspiracy. He argues that Justice and Hoercherl occupied that role.
 
 
 20
 We review this finding only for clear error. United States v. Wright, 873 F.2d 437, 442-44 (1st Cir. 1989); United States v. Vega-Encarnacion, 914 F.2d 20, 24 (1st Cir. 1990). From what we have already said about Casillas's participation, it is manifest that there was no error. His acceptance of the role of broker, his recruiting efforts, and his central role in negotiating, planning and delaying meetings support the finding. Moreover, Agent Justice testified that Casillas was to be given a percentage of the sale proceeds plus fifty kilograms of cocaine. This record satisfies most, if not indeed all, of the factors characterizing a leadership role specified in U.S.S.G. § 3B1.1(c). See id., comment. (note 3).
 
 
 21
 Intent to Accomplish Sale of 150 Kilograms. All three appellants claim that the negotiated amount of 150 kilograms should not be used in calculating their offense levels. Casillas argues that the amount of drugs, "if any," should be either 50 kilograms (the total he claims that he intended to purchase) or "around 7 kilograms." Bonilla argues that, since the sum seized could have purchased only 7.7 kilograms (at $12,500 per kilo), this figure should have been used, resulting in an offense level of 30, not 38. Faccio argues that the only evidence of his involvement in the enterprise was his tape recorded remarks concerning his interest in purchasing, at most, 25 kilograms.
 
 
 22
 In addressing these contentions, we are directed by two guidelines. U.S.S.G. § 1B1.3(a)(1)(B) provides that a conspirator is responsible for all criminal acts in furtherance of the conspiracy and they are includible in the defendant's offense level to the extent that they are either within the scope of the criminal activity embraced by the defendant's agreement or "reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake." See id., comment. (note 2). In addition, in connection with then applicable U.S.S.G. § 2D1.4, comment. (note 1) (1991), the amount of drugs sought or under negotiation in a conspiracy should be used if the amount seized is less and defendant intended to produce and was "reasonably capable" of producing the larger amount. This instruction applies to buyers as well as sellers and includes those who negotiate purchases from undercover agents. United States v. Frazier, 985 F.2d 1001, 1002-3 (9th Cir. 1993).
 
 
 23
 There can be no question that appellant Casillas was properly charged with the intent to bring about the purchase of 150 kilograms. He was in the center of developments from the very beginning, when the total amount contemplated was 600 kilograms, and privy to every subsequent change of plans.
 
 
 24
 With reference to Bonilla the district court found that he was "fully aware of the total amount negotiated and he produced a substantial amount of money towards the purchase of the 150 kilograms of cocaine. [He] played an instrumental role in the conspiracy as a financier, an essential part of the conspiratorial scheme."
 
 
 25
 With reference to Faccio, the court found that he "was aware of the total amount negotiated and he negotiated to produce the monies for the purchase of 150 kilograms of cocaine. As one of the financier[s] his role in the conspiracy was instr[u]mental." The court filed supplemental findings, after reviewing its notes and the arguments of the parties, that Faccio had "negotiated the amount of 150 kilograms of cocaine, that the amount of money corresponding to quantity and the condition [sic] for the delivery were also a part of the discussions."
 
 
 26
 We review a trial court's determination of the amount of drugs included in the offense for sentencing purposes under the strict "clearly erroneous" standard. United States v. Panet-Collazo, 960 F.2d at 261. Can we say that the court was clearly wrong in finding that Bonilla and Faccio, called in to provide the second half of the required down payment, could reasonably foresee the wider reaches of the scheme? Whether or not Faccio was to receive substantial amounts of cocaine as extra compensation, as some testimony indicated, we cannot believe that it was irrational to find that Bonilla, who contributed nearly $100,000, and Faccio, who, according to the taped record of the August 13 meeting, was willing to give a deed to his property, knew of the extent of the underlying agreement. Specifically, the court cannot be faulted for concluding that Faccio and Bonilla knew that the cash contribution Bonilla would make would complete the $400,000 down payment required to transfer the title to 25 kilograms, obtain the delivery of another 25 kilograms on consignment, and pave the way, if the money count was satisfactory, to the delivery later in the day of 100 kilograms which could be sold before payment was made to the sellers.
 
 
 27
 In short, even though Faccio and Bonilla came in at the last chapter, it was a chapter that reflected all that had gone before. The roles of both men were far more significant than that of a guard for a "money man" where, in United States v. Alfonso Mena-Robles and Miguel Torres-Rivera, Nos. 92-1233, 1299, slip op. at 21 (1st Cir. Sept. 28, 1993), we held, "his general knowledge of the size of the cocaine deal is inferable." We therefore hold that the court's findings of the appellants' knowledge and intent were not clearly erroneous.
 
 
 28
 Capacity to Finance the 150 Kilogram Purchase. Faccio is the only appellant who clearly raises a challenge to the district court's 150-kilogram finding by arguing that the government failed to carry its burden of showing, by a preponderance of the evidence, that he was reasonably capable of buying that much cocaine from the government agents. He relies on our statements in United States v. Estrada-Molina, 931 F.2d 964, 966 (1st Cir. 1991) and United States v. Bradley, 917 F.2d 601, 604-05 (1st Cir. 1990), where we said that the government had the burden of proving capability as well as intent to produce the quantity proposed to be used for determining the offense level.
 
 
 29
 Neither the government below nor the district court responded to this argument. In reviewing the record we can understand why. The thrust of Faccio's objections to his pre-sentence report was that, not understanding English, he did not know the extent of the planning, and his own intended purchase was limited to 25 kilograms. He invoked U.S.S.G. § 2D1.4, comment. (note 1) (now consolidated as part of U.S.S.G. § 2D1.1, comment. (note 12)), recognizing the inappropriateness of considering the total amount negotiated when the court finds the defendant "did not intend to produce and was not reasonably capable of producing the negotiated amount." He also cited Estrada-Molina.
 
 
 30
 But even these passing references to capability disappeared at the subsequent hearing on objections to the presentence report. Faccio repeatedly stated his position that the evidence did not support a finding that he knew or had anything to do with facilitating the purchase of more than 25, or at most 50, kilograms. The issue of Faccio's capability to produce sufficient funds was never presented to the district court.
 
 
 31
 Since, however, the leveraging effect of considering negotiated but undelivered amounts is so enormous, we look at the record. Our conclusion is that, though harsh, it supports the higher offense level of 38. We first point out that the planned purchase of 150 kilograms (about which Faccio was told at the August 10, untaped meeting, notwithstanding the fact that the August 13 meeting made no mention of this amount), was not to be made wholly in cash. The requirements had been narrowed to a down payment of $400,000. This would trigger the immediate delivery of complete title to 25 kilograms and delivery, on consignment, of another 25 kilograms, followed by a delivery for sale and later repayment of 100 kilograms. The first half of the down payment had been supplied by the Ortiz collateral. And what was actually delivered by Bonilla was approximately half of the remaining $200,000. So the focus must be: would the district court have been clearly in error in finding Faccio capable of providing the remaining $100,000?
 
 
 32
 What we find in the record are unrebutted intimations of Faccio's capacity to do so. On August 13, Faccio was recorded saying that he could give a deed to his property and that "I have there over $83,000 that are mine." This is followed by a statement by Casillas that Faccio had property worth $800,000, and by Hoercherl's comment that the amount was a million. Then there is the evidence that Bonilla and his wife were prepared to pay $103,000 for one of Faccio's apartments. We do not know the size of the apartment building, but the record discloses that there were five floors, that perhaps half had been sold (occupied by professional people), with half yet to be sold. Perhaps most compelling is the statement in Faccio's pre-sentence report, unobjected to, that the government had confiscated properties valued at over two million dollars. All this may not be conclusive, for mortgage indebtedness is not revealed. But the district court was surely entitled to accept these figures, absent any indication that they were misleading. All of these indicia meet if not exceed those we found sufficient to prove capacity in United States v. Bradley, 917 F.2d 601 (1st Cir. 1990).
 
 
 33
 In objecting to his pre-sentence report, Bonilla merely stated that he had been able to come up with only the money seized (nearly $98,000), not $200,000. He did not specifically argue incapacity in either his appellate brief or at oral argument. Even were we to consider such an argument now, we should have to treat Bonilla as accountable for the reasonable capacity of his co-conspirators. As the Sixth Circuit held in United States v. Snelling, 961 F.2d 93, 96 (1991),
 
 
 34
 Since the negotiated amount in this reverse buy was three kilograms and the co-defendants had sufficient funds at the time of arrest to purchase three kilograms of cocaine, the district court was correct in utilizing a base level of 28.
 
 
 35
 As we said of a defendant making a similar argument in Mena-Robles, appellant's "personal financial ability is inapposite to the matter at hand." Nos. 92-1233, 1299, slip op. at 19 (1st Cir. Sept. 28, 1993) (emphasis in original).
 
 
 36
 Casillas advanced an incapacity argument only conclusorily and obliquely. But, again, spurred by the dramatic impact of the total amount negotiated on his prison sentence, we have reviewed the record. Here, unlike with Faccio and Bonilla, we are not concerned with Casillas's own ability to finance the purchases. Casillas's role was that of finder, facilitator, recruiter. That he performed this role with considerable effectiveness was shown by his track record in this case. Being a middleman, his own inability to pay is not controlling. United States v. Fowler, 990 F.2d 1005, 1006-08 (7th Cir. 1993). He supplied the financiers with most of the down payment; it is likely that any shortfall could have been remedied; he would be free to sell the cocaine delivered on consignment and have the remaining 100 kilos delivered without down payment.
 
 
 37
 We therefore reject the arguments asserting lack of proof of the defendants' ability to finance the down payment for the planned 150 kilogram transaction.
 
 
 38
 AFFIRMED.