April 16, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1890

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL BARNETT,

Defendant, Appellant.

No. 91-1891

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY JORDAN,

Defendant, Appellant,

No. 92-1778

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY JORDAN,

Defendant, Appellant.

ERRATA SHEET

The opinion of this Court issued March 29, 1993, is amended as
follows:

Page 22, line two of text after block quote, should read: . . .
476 U.S. 1115 (1986) . . . .

April 7, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1890

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL BARNETT,

Defendant, Appellant.

No. 91-1891

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY JORDAN,

Defendant, Appellant,

No. 92-1778

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY JORDAN,

Defendant, Appellant.

3

ERRATA SHEET

The opinion of this Court issued March 29, 1993, is amended as
follows:

Page 28, last line of text, should read: . . . since there were
none.

March 29, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1890

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL BARNETT,

Defendant, Appellant.

No. 91-1891

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY JORDAN,

Defendant, Appellant,

No. 92-1778

UNITED STATES OF AMERICA,

Appellee,

v.

BARRY JORDAN,

Defendant, Appellant.

5

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Breyer, Chief Judge,

Cyr and Boudin, Circuit Judges.

Gayle C. Wintjen with whom McGuinness & Parlagreco was on brief

for appellant Michael Barnett.
George F. Gormley for appellant Barry Jordan.

Joseph M. Walker III, Assistant United States Attorney, with whom

A. John Pappalardo, United States Attorney, was on brief for appellee.

March 29, 1993

CYR, Circuit Judge. Appellants Michael Barnett and Barry Jordan
CYR, Circuit Judge.

were charged, in a three-count indictment, with conspiracy to manufac-

ture and possess with intent to distribute methamphetamine in viola-

tion of 21 U.S.C. 846, possession with intent to distribute metham-

phetamine in violation of 21 U.S.C. 841(a) (1), and possession of a

listed chemical in violation of 21 U.S.C. 841(d)(1). Barnett was

convicted on all three counts at trial; Jordan pleaded guilty to all

three counts shortly after the commencement of trial. Each was

sentenced to a thirty-year prison term and a ten-year term of super-

vised release. On appeal, Barnett raises several challenges to his

conviction, and joins Jordan in contesting the drug-quantity finding

made by the district court at sentencing. We affirm.

I

BACKGROUND

In March 1990, the United States Drug Enforcement Agency ("DEA")

began investigating a suspected conspiracy to manufacture and distrib-

ute methamphetamine. Surveillance was initiated at three sites in the

Scituate, Massachusetts area: the residences of each appellant and

the residence of their codefendant, Timothy Fitzgerald.1

Approximately a year before the investigation began, a trailer

storage company had delivered a forty-foot trailer to Fitzgerald's

1Fitzgerald was acquitted at trial.

3

residence in Scituate. The employee who made the delivery later

testified that the recipient of the trailer, known to him as "Tim,"

instructed that the trailer be placed as far back as possible into the

woods located on the property. Barnett subsequently rented the

trailer from Fitzgerald.

In early May, 1990, undercover DEA Agent John Kelly offered to

sell Jordan hydriodic acid ostensibly stolen by Kelly.2 At their

meeting, Jordan explained that his "chemist" had enough pseudoephed-

rine to produce forty pounds (eighteen kilograms) of methamphetamine,

but needed twenty pints of hydriodic acid for the manufacturing

process. During their tape-recorded conversation, Jordan agreed to

buy twenty pints of hydriodic acid, and to provide Kelly with four

ounces of methamphetamine in return. Jordan assured Kelly that he

would receive four "uncut" ounces, and suggested that Kelly could

double the volume by diluting the pure methamphetamine with an equal

amount of "cut," then sell the resulting eight ounces for $2,000 an

ounce.

Jordan described the methamphetamine manufacturing process to

Kelly, explaining that it took seven to eight days, and that his

chemist produced ten pounds of methamphetamine in each batch. To

allay Kelly's concern about the danger of a laboratory explosion,

2Hydriodic acid, a listed chemical, is essential to methamphet-
amine production using the "ephedrine reduction process," which also
requires either ephedrine or pseudoephedrine; red phosphorus may also
be used as a purifying agent. To convert the methamphetamine into
powder for distribution, it is dissolved into freon liquid, then
bubbled in hydrogen chloride gas.

4

Jordan explained that his chemist had been manufacturing methamphet-

amine for ten years, and volunteered that he had assisted the chemist

in preparing eight to ten batches one summer.3

As promised, on May 16, 1990, Kelly delivered two boxes contain-

ing twenty half-liter bottles (approximately twenty pints) of hyd-

riodic acid to Jordan. A different DEA agent followed Jordan to

Barnett's residence, where he observed Jordan and Barnett unloading

two boxes from the trunk of Jordan's car.

The DEA conducted a series of aerial surveillance fly-overs

during May 1990. A fly-over of the Fitzgerald residence on or about

May 27 revealed an electrical power cord running from the main house

to the trailer. (The ephedrine reduction process requires a power

source to heat the chemicals.)

Two subsequent fly-overs of the Fitzgerald residence were con-

ducted using an infrared heat-detecting device which operates in

either of two polarity modes: "white-hot" or "black-hot." When the

device is in the white-hot mode, objects emitting heat appear white on

an attached screen; in the black-hot mode, heat-emitting objects

appear black. The device detected no heat emission from the trailer

during a fly-over on May 28. On May 30, Massachusetts State Police

3After pleading guilty during trial, Jordan submitted an affida-
vit in which he insisted that these statements were mere "puffing,"
intended to convince Kelly that he was willing and able to complete
their transaction. The affidavit attests that Jordan knew nothing
about the manufacture of methamphetamine, and that his only role in
the enterprise was to obtain hydriodic acid in exchange for a small
amount of money to support his heroin habit.

5

Trooper Richard Welby, who had relatively little experience with the

infrared equipment, conducted another fly-over. Welby, erroneously

believing the device was in the white-hot mode, observed that the

trailer appeared white on the screen, and concluded that it was

emitting heat. Subsequent analysis revealed, however, that the device

actually was in the black-hot mode during the May 30 fly-over, and the

infrared images, properly interpreted, indicated that the trailer was

emitting no detectible heat.

On the afternoon of May 30, a DEA agent followed Barnett to the

Fitzgerald property. When Barnett disappeared down the driveway, the

agent left his vehicle and surreptitiously followed on foot. The

agent spotted the trailer and saw Barnett inside. The agent noticed

several blue buckets, a white radiator, and two boxes in the rear of

the trailer. As the agent watched, Barnett scraped the bottom of one

of the blue buckets for approximately five minutes, then poured liquid

into the bucket. Barnett left the trailer and entered the main house,

returning with several paper towels with which he filtered the yellow

slushy contents of the bucket, then poured the filtered substance into

a gray painter's tray. Barnett made another trip to the main house,

this time returning with clear plastic sandwich bags. He picked up

the gray painter's tray, rocked it back and forth several times, then

poured the yellow slushy substance into one of the bags, double-bagged

it, and returned once again to the main house.

The DEA agent returned to his vehicle, and waited for Barnett to

drive away. After about twenty-five minutes, Barnett left the

6

Fitzgerald property and drove to a shopping center, unaware that he

was being followed by the agent. When the agent pulled into the

shopping center parking lot, he noticed a second individual in Bar-

nett's vehicle. The agent identified the second individual as appel-

lant Jordan.

On May 30, DEA Agent Lemon compiled the information obtained from

the various surveillance operations (including the erroneous heat-

imaging data interpretation) in an affidavit, which he attached to an

application for a warrant to search the trailer on the Fitzgerald

property, the Fitzgerald and Jordan residences, and a residence

believed to be occupied by Barnett.

The investigation culminated early the next morning when the

search warrants were executed. First, agents searched the Fitzgerald

trailer, unveiling a partially assembled laboratory containing an

array of chemicals, including hydriodic acid, acetone, freon, and

hydrogen chloride gas, and an assortment of equipment associated with

methamphetamine production, including a radiator, a fan, flasks,

tubes, and a heater-timer. Three ounces of methamphetamine crystals

and a bucket containing approximately one pound of methamphetamine

crystals in two and one-half pounds of an acetone/freon solution were

also discovered. Subsequent analysis determined that the methamphet-

amine found in the bucket was between 90 and 100 percent pure.

DEA agents arrested Jordan and Fitzgerald at their respective

residences. At Jordan's residence, agents seized a small quantity of

a mixture containing heroin and methamphetamine, as well as a valium

7

tablet, several hypodermic needles, and several publications describ-

ing the methamphetamine manufacturing process. At Fitzgerald's

residence, agents found a piece of paper listing the chemical ingredi-

ents needed to produce methamphetamine using the ephedrine reduction

process ("the Fitzgerald chemical list").

Barnett no longer resided at the residence for which the fourth

search warrant had been obtained. When DEA agents arrested Barnett at

his new residence, he was advised of his Miranda rights and that the

laboratory had been discovered at the Fitzgerald property. Agents

searched Barnett's new residence,4 and discovered a warehouse re-

ceipt. In response to a question from Agent Lemon about the receipt,

Barnett revealed that the remaining equipment and chemicals were in a

storage bin at the warehouse. A warrant was secured and the search of

the storage bin uncovered approximately fifteen pounds of red phospho-

rous, a seventy-pound drum containing an unspecified quantity of

hydriodic acid, a fifty-kilogram container of pseudoephedrine slightly

less than half full, and various other chemicals, glassware, cooking

devices, protective gear and gloves.

At DEA headquarters, after determining that Barnett had been

advised of his Miranda rights, DEA agent Boeri engaged Barnett in

conversation about the methamphetamine operation. In response to

Boeri's questions, Barnett admitted that he was the "chemist," indi-

cated that he had experienced no difficulty obtaining chemicals, and

4Barnett contests the district court ruling that the warrantless
search was consensual. See infra at pt. II.B.1.

8

explained that his methamphetamine was "ninety nine and one percent"

pure as a consequence of the two "extra" manufacturing steps he

performed.

Five days into their joint trial, Jordan pleaded guilty to all

counts. Thereafter, the jury convicted Barnett, and acquitted

Fitzgerald, on all counts.

II

DISCUSSION

A. Sentencing Issues

Barnett and Jordan challenge the sentencing court's determination

that each was responsible for twenty-nine kilograms of pure metham-

phetamine. Jordan alone contests the court's drug purity ruling. We

review for clear error, see 18 U.S.C. 3742(e); United States v.

Panet-Collazo, 960 F.2d 256, 262 (1st Cir.), cert. denied, U.S.

, 113 S. Ct. 220 (1992); United States v. Weston, 960 F.2d 212, 220

(1st Cir. 1992), with a view to whether the factual findings made by

the sentencing court were supported by a preponderance of the reliable

information. See, e.g., United States v. Rodriguez-Cardona, 924 F.2d

1148, 1155 (1st Cir.), cert. denied, U.S. , 112 S. Ct. 54

(1991); United States v. Zuleta-Alvarez, 922 F.2d 33, 37 (1st Cir.

1990), cert. denied, U.S. , 111 S. Ct. 2039 (1991).

1.Drug Quantity

The district court adopted the drug-quantity findings set out in

9

the presentence reports ("PSRs").5 Each PSR provided, in relevant

part:

In this offense, the defendant secured a 50 kilogram drum of
pseudoephedrine which would make 29 kilograms of pure metham-
phetamine. There was every indication that they had the
materials to produce this full amount. As such, the Drug
Quantity Table under [s]ubsection (c), offenses involving at
least 10 kilograms but less than 30 kilograms of pure metham-
phetamine provides for a base offense level of 40.

Appellants insist that the court overestimated the capacity of their

drug manufacturing operation and that their sentences should have been

based exclusively on the quantity of methamphetamine seized.

The sentencing guidelines direct that a defendant who is convict-

ed of conspiring or attempting to commit any offense involving a

controlled substance shall be assigned the same base offense level "as

if the object of the conspiracy or attempt had been completed."

U.S.S.G. 2D1.4. Further guidance is provided in an application

note:

Where there is no drug seizure or the amount seized does not

reflect the scale of the offense, the sentencing judge shall

approximate the quantity of the controlled substance. In
making his determination, the judge may consider, for exam-
ple, the price generally obtained for the controlled sub-
stance, financial or other records, similar transactions in
controlled substances by the defendant, and the size or

5Appellants mistakenly suggest that the court made no specific
finding as to the quantity of drugs for which they were being held
responsible. The court checked the box on the "Statement of Reasons"
form attached to the judgment relating to each defendant, thereby
clearly indicating that "[t]he court adopt[ed] the factual findings
and guideline application in the presentence report." We therefore
reject their Rule 32(c)(3)(D) claim.

10

capability of any laboratory involved.

U.S.S.G. 2D1.4, comment. (n.2) (1991) (emphasis added).

Three ounces of methamphetamine crystals, and a bucket containing

an additional pound of methamphetamine crystals in two and one-half

pounds of liquid, were seized. Nevertheless, the district court

reasonably concluded that the quantity of methamphetamine seized did

not accurately reflect the scale of the offense, see id., especially

in view of Jordan's admissions that his "chemist" had at hand the

ingredients with which to produce forty pounds of methamphetamine, and

in view of the equipment found in the trailer and storage facility,

and the sizable quantities of precursor chemicals seized. Accord-

ingly, under the sentencing guidelines the district court did not err

in estimating the drug quantity.

The court based its drug-quantity calculation on the amount of

methamphetamine producible with fifty kilograms of pseudoephedrine.

Barnett and Jordan object to this calculation because it disregards

the undisputed fact that the fifty-kilogram drum contained only

twenty-three kilograms of pseudoephedrine when it was seized. More-

over, Jordan insists that the court's approximation of the quantity of

methamphetamine was flawed because other essential precursor chemicals

were not seized in the quantities required to produce twenty-nine

kilograms of methamphetamine, in particular hydriodic acid.

In approximating the producible quantity of controlled substance,

the sentencing court may consider the amount of precursor chemicals

11

possessed. See, e.g., United States v. Beshore, 961 F.2d 1380, 1383-

84 (8th Cir.), cert. denied, U.S. , 113 S. Ct. 241 (1992), and

cert. denied, U.S. , 113 S. Ct. 243 (1992); United States v.

Short, 947 F.2d 1445, 1456-58 (10th Cir. 1991), cert. denied, U.S.

, 112 S. Ct. 1680 (1992); United States v. Aichele, 941 F.2d 761,

766 (9th Cir. 1991); United States v. Macklin, 927 F.2d 1272, 1281

(2nd Cir.), cert. denied, U.S. , 112 S. Ct. 146 (1991); United

States v. Kingston, 922 F.2d 1234, 1236-38 (6th Cir. 1990), cert.

denied, U.S. , 111 S. Ct. 2054 (1991); United States v.

Smallwood, 920 F.2d 1231, 1236-38 (5th Cir.), cert. denied, U.S.

, 111 S. Ct. 2870 (1991). Although the sentencing court must "'err

on the side of caution'" in selecting from among plausible alternative

drug-quantity estimates, United States v. Sklar, 920 F.2d 107, 113

(1st Cir. 1990) (quoting United States v. Walton, 908 F.2d 1289, 1301

(6th Cir.), cert. denied, U.S. , 111 S. Ct. 273 (1990)), we

cannot conclude that its approximation is constrained by the precur-

sor-chemical quantities actually seized, see Beshore, 961 F.2d at 1383

(approximation of drug quantity "does not require that every precursor

chemical be present"). Rather, U.S.S.G. 2D1.4 expressly authorizes

consideration of the size or capability of any laboratory. See United

States v. Havens, 910 F.2d 703, 705 (10th Cir. 1990), cert. denied,

U.S. , 111 S. Ct. 687 (1991) (explaining that a drug-quantity

estimate "should be equal to the amount of drugs produceable if the

precursor chemicals possessed by the defendant were combined with

proportionate amounts of the missing ingredients including processing

12

equipment"); see also United States v. Bertrand, 926 F.2d 838, 846

(9th Cir. 1991) (finding no clear error in drug-quantity approximation

based on capacity of methamphetamine lab, notwithstanding lack of

hydriodic acid); Smallwood, 920 F.2d at 1237 (upholding drug-quantity

finding notwithstanding absence of precursor chemicals); cf. United

States v. Gerante, 891 F.2d 364, 368-70 (1st Cir. 1989) (basing

approximation of drug quantity on discovery at defendant's residence

of $68,000 believed to be proceeds from recent drug sale). As we see

it, the quantity of essential precursor chemicals seized, like the

capacity of the laboratory and the evidence relating to the overall

scheme, see Smallwood, 920 F.2d at 1237-38, is but one among several

circumstantial factors appropriately considered in approximating drug

quantities for sentencing purposes.

We must determine whether the government presented sufficient

reliable information to permit the court reasonably to conclude that

appellants were responsible for a quantity of drugs at least equal to

the quantity threshold for the assigned base offense level. See

Sklar, 920 F.2d at 113. The base offense level assigned each appel-

lant was 40, the level applicable to offenses involving between ten

and thirty kilograms of unadulterated methamphetamine. A DEA chemist

testified at trial that fifty kilograms of pseudoephedrine would yield

twenty-nine kilograms of methamphetamine.6 Utilizing the same ratio

6Jordan points out that the court did not state that it was
relying on the DEA chemist's testimony, that the drug quantity approx-
imation in the PSR is not attributed to the chemist, and that Jordan
had no opportunity to cross-examine the chemist, who testified after

13

one unit of pseudoephedrine per a .58 unit of methamphetamine

the twenty-three kilograms of pseudoephedrine seized in the fifty-

kilogram drum would yield approximately thirteen kilograms of metham-

phetamine, a quantity sufficient to warrant the base offense level of

40.

The DEA chemist further testified that the ephedrine reduction

process requires hydriodic acid in quantities from one to four times

the amount of pseudoephedrine, depending upon the particular "recipe."

Although the evidence does not establish the exact amount of hydriodic

acid the defendants possessed, approximately ten liters were seized,

along with an unspecified quantity found in a seventy-pound container

at the warehouse. In addition, an empty seventy-pound hydriodic acid

container was found at the trailer.

Furthermore, Jordan admitted to Agent Kelly that he and the

"chemist" had all the necessary ingredients, with the exception of the

hydriodic acid being procured from Kelly, with which to manufacture

forty pounds (eighteen kilograms) of methamphetamine immediately. The

court also had before it the Fitzgerald chemical list, reflecting

chemical quantities sufficient to produce at least twenty-nine kilo-

Jordan had entered his guilty plea.
"A sentencing hearing need not meet all the procedural safeguards
and strict evidentiary limitations of a criminal trial." Zuleta-

Alvarez, 922 F.2d at 36. The sentencing court may rely on extrinsic

evidence which was not subjected to cross-examination, so long as
there are "'sufficient indicia of reliability to support its probable
accuracy.'" Id. at 36 (quoting U.S.S.G. 6A1.3). Jordan failed to

present any evidence at sentencing to refute the drug-quantity approx-
imation in the PSR. We discern no clear error in the sentencing
court's reliance on the DEA chemist's trial testimony.

14

grams of methamphetamine. Some quantity of each chemical on the list

was seized either from the trailer or the warehouse and in the size

container specified on the list.7 Appellants' PSRs also contain the

uncontroverted statements that Barnett produced approximately eight

pounds of methamphetamine in December 1989 and that Jordan participat-

ed in its distribution. Neither appellant presented countervailing

drug-quantity or chemical-quantity evidence at sentencing.

We discern no clear error. The district court had before it

sufficient reliable information to support a finding that Barnett and

Jordan were actually responsible for not less than ten kilograms of

methamphetamine, warranting a base offense level of 40.

2. Drug Purity

An explanatory note appended to the Drug Quantity Table distin-

7The Fitzgerald chemical list reads as follows:
d-pseudoephedrine Hcl.
50 kilo drum
Hydriodic Acid
4 - 70 lb drum

Red Phosphorus
15 lb
R-IIFreon
7 - 100 lb drums
Methyl Alchohol [sic]
(methanol)
5 - 5 gal drums
Acetone
7 - 5 gal drums

Among the seized chemicals were a partially filled fifty-kilogram drum
of pseudoephedrine, one empty and one partially filled seventy-pound
hydriodic acid drum, several one-pound bottles of red phosphorus, a
100-pound drum of freon, several five-gallon containers of methanol,
and two five-gallon acetone containers.

15

guishes between the terms "methamphetamine (actual)" and "metham-

phetamine":

Unless otherwise specified, the weight of a controlled sub-
stance set forth in the table refers to the entire weight of
any mixture or substance containing a detectable amount of
the controlled substance . . . . The term[] . . . "[m]etham-
phetamine (actual)" refer[s] to the weight of the controlled
substance, itself, contained in the mixture or substance.

U.S.S.G. 2D1.1(c). The table prescribes a base offense level of 40

for offenses involving between ten and thirty kilograms of "metham-

phetamine (actual)," whereas the same quantity of adulterated "metham-

phetamine" carries a base offense level of 36. Now, for the first

time, Jordan argues that the record does not establish the purity of

the methamphetamine for which he was held responsible, and that his

base offense level should have been computed under the Drug Quantity

Table entry for adulterated "methamphetamine" rather than "methamphet-

amine (actual)."

Issues not squarely raised in the district court will not be

entertained on appeal. See United States v. Haggert, 980 F.2d 8, 10-

11 (1st Cir. 1992) (collecting cases). Although defense counsel

consistently referred to base offense levels corresponding to

adulterated "methamphetamine" rather than "methamphetamine (actual),"

both at sentencing and in opposition to the PSR, at no time did he

expressly raise drug purity as an issue in the district court.

"Judges are not expected to be mindreaders. Consequently, a litigant

has an obligation to spell out [his] arguments squarely and distinct-

ly, or else forever hold [his] peace." United States v. Zannino, 895

16

F.2d 1, 17 (1st Cir.) (internal citations and quotation marks omit-

ted), cert. denied, 494 U.S. 1082 (1990). The drug-purity claim must

be deemed waived, as it was never raised below.8

B. Suppression Issues

1. The Consensual Search

Barnett filed a pretrial motion to suppress certain physical

evidence and admissions, on the ground that he did not voluntarily

consent to the warrantless search of his residence. The district

court disagreed. We review for clear error. United States v. Wilkin-

son, 926 F.2d 22, 24 (1st Cir.), cert. denied, , U.S. , 111 S.

Ct. 2813 (1991); United States v. Twomey, 884 F.2d 46, 51-52 (1st Cir.

1989), cert. denied, 496 U.S. 908 (1990). A warrantless residential

search violates the Fourth Amendment unless it comes within one of the

"'few specifically established and well-delineated exceptions[,]'"

8The raise-or-waive rule will be relaxed only in exceptional
cases involving a gross miscarriage of justice where the belated claim
is "'so compelling as virtually to insure appellant's success.'"
Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979)

(quoting Dobb v. Baker, 505 F.2d 1041, 1044 (1st Cir. 1974)); see

United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992); Haggert, 980

F.2d at 10-11; Hernandez-Hernandez v. United States, 904 F.2d 758, 763

(1st Cir. 1990). This narrow exception is unavailing in the present
case.
The sentencing court had before it evidence that Barnett per-
formed extra manufacturing steps to assure maximum purity, that Jordan
promised to deliver "uncut" methamphetamine to Agent Kelly, that
Barnett boasted to Agent Boeri that his methamphetamine had been
analyzed "ninety-nine and one hundred percent" pure, and that the
methamphetamine seized at the trailer was between ninety and one
hundred percent pure. Absent any evidence that the methamphetamine
was diluted or adulterated in any manner, the sentencing court was
presented with insufficient evidence to sustain Jordan's present drug-
purity claim.

17

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v.

United States, 389 U.S. 347, 357 (1967)), which include consensual

searches, id. at 219, 228. The voluntariness of a consent to search

turns on an assessment of the totality of the circumstances. United

States v. Mendenhall, 446 U.S. 544, 557 (1980); Schneckloth, 412 U.S.

at 227. Among the individualized factors bearing on the vulnerability

of the consenting party are age, education, experience, intelligence,

and knowledge of the right to withhold consent. More general consid-

erations include whether the consenting party was advised of his or

her constitutional rights and whether permission to search was ob-

tained by coercive means or under inherently coercive circumstances.

Id. at 226; Twomey, 884 F.2d at 51. Although sensitivity to the

heightened possibility of coercion is appropriate when a defendant's

consent is obtained during custody, see Schneckloth, 412 U.S. at 240,

n.29, "custody alone has never been enough in itself to demonstrate

. . . coerced . . . consent to search." United States v. Watson, 423

U.S. 411, 424 (1976).

Barnett argues that his consent was coerced, in that he was met

at the door of his home by seven or eight law enforcement officers,

with guns drawn. Immediately after he was arrested and handcuffed,

the officers holstered their weapons and advised Barnett of his

Miranda rights. Barnett was then asked if he would consent to a

18

search of the premises.9 Barnett claims that he was never informed

that he could withhold his consent, he was given no consent form, and

he was led to believe that the officers already had a search warrant

because they began searching the premises immediately upon entering,

prior to requesting consent.

Written consent is not essential to the establishment of a valid

consensual search. See, e.g., United States v. Chaidez, 906 F.2d 377,

382 (8th Cir. 1990) (search may be justified by voluntary oral consent

even in the absence of valid written consent); United States v.

Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988) (defendant's refusal to

sign a consent form does not preclude a finding of voluntariness).

Moreover, it is not essential that the officers first inform the

consenting party of the right to withhold consent, though knowledge of

the right to withhold consent is a factor to be considered in assess-

ing voluntariness, Schneckloth, 412 U.S. at 227; see also Florida v.

Rodriguez, 469 U.S. 1, 6-7 (1984).

Although Barnett testified that agents began "searching, looking

under things," and "opening drawers and cabinets," Lemon testified

9Barnett testified that, following his arrest, he was told by
Agent Lemon: "Mike, we are just going to look around and take you
down to the Marshfield Police Station, okay?" Barnett replied,
"Okay." Barnett contends that he was merely acknowledging his arrest
and inevitable booking, not consenting to a search of his residence.
Based on Agent Lemon's testimony, however, the court found that
Barnett was asked: "Mind if I look around the house?" and responded,
"Go ahead. You'd probably get a search warrant anyway." The district
court was presented with a pure credibility determination. We find no
clear error in its determination that Lemon's version of the events
was more credible.

19

that a protective sweep was conducted immediately upon entering the

premises to ensure that no one else was present.10 Thereafter, ac-

cording to Lemon, the agents "just [stood] around" until Barnett

consented to a further search. We find no clear error in the trial

court's credibility-based ruling that "a sweep search was conducted."

Barnett's contention that the search conducted immediately upon

entry led him to believe that the agents already had a search warrant

cannot succeed in any event. The district court expressly found that

Barnett responded as follows to Lemon's request for consent to search:

"Go ahead. You'd probably get a search warrant anyway[]" (emphasis

added), plainly implying Barnett's understanding that the agents had

no search warrant and needed his consent.

Notwithstanding the inherently unnerving effect of having numer-

ous officers arrive at one's door with guns drawn, Barnett was no

"newcomer" to law-enforcement encounters. See United States v.

Kimball, 741 F.2d 471, 474 (1st Cir. 1984). Barnett had been convict-

ed of at least eighteen prior offenses and arrested on at least eight

previous occasions. Thus, we may fairly presume that he was "less

likely than most to be intimidated by the agents' show of force."

United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976), cert.

10A sweep search is "narrowly confined to a cursory visual
inspection of those places in which a person might be hiding," Mary-

land v. Buie, 494 U.S. 325, 327 (1990). The officers are permitted to

take reasonable steps to ensure their safety, and may, "without
probable cause or reasonable suspicion, look in closets and other
spaces immediately adjoining the place of arrest from which an attack
could be immediately launched." Id.

20

denied, 426 U.S. 908 (1976), and cert. denied, 426 U.S. 922 (1976).

In addition, before he was asked to consent to the search, all guns

had been holstered and Barnett was advised of his Miranda rights,

"'put[ting] him on notice that he [could] refuse to cooperate,'" id.

(quoting Gorman v. United States, 380 F.2d 158, 164 (1st Cir. 1967)).

Finally, there was no evidence of overt or covert threats or pressure

to exact Barnett's consent.

In these circumstances, we conclude that Barnett's will was not

overborne, nor his "capacity for self-determination critically im-

paired." Schneckloth, 412 U.S. at 225. Ultimately, as we are not

"'left with the definite and firm conviction that a mistake has been

committed,'" Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)

(quoting United States v. United States Gypsum Co., 333 U.S. 364, 395

(1948)), we find no clear error in the trial court's determination

that Barnett's consent was voluntary.

2. The Lemon Affidavit

Next, Barnett claims that the district court erred in refusing to

suppress evidence obtained as a result of alleged false statements in

the affidavit supporting the search warrant application. Barnett

contends that the erroneous heat-imaging test data in the Lemon

affidavit was materially false or included with reckless disregard for

its truth. Without it, says Barnett, the Lemon affidavit was insuffi-

cient to establish probable cause to search the trailer.

The district court conducted an evidentiary hearing pursuant to

21

Franks v. Delaware, 438 U.S. 154 (1978). Franks findings are reviewed

for clear error. United States v. Cole, 807 F.2d 262, 268 (1st Cir.

1986), cert. denied, 481 U.S. 1069 (1987). The questions for us are

(1) whether Barnett established by a preponderance of the evidence at

the Franks hearing that the affidavit was perjurious, or prepared with

reckless disregard for its truth, and (2) whether the affidavit,

without the false material, was insufficient to establish probable

cause for the search. If so, the warrant was void and the fruits of

the search must be suppressed. Franks, 438 U.S. at 155-56.

Barnett claims that the heat-imaging data Trooper Welby provided

to Lemon, see supra at pp. 5-6, was either deliberately or recklessly

false, because Welby failed to inform Lemon that he lacked training

and experience in operating the device and failed to examine the

device prior to the May 30 flyover to determine which polarity mode

was operative.

The district court finding that Welby did not act in bad faith

was not clearly erroneous. There is no evidence that Welby intention-

ally misinterpreted the data from the infrared equipment. Rather, the

evidence strongly suggests, just as the court found, that Welby

sincerely believed, albeit mistakenly, that the equipment was in the

"white-hot" polarity mode during the fly-over.

Neither is there evidence that Lemon knew that the heat-imaging

data was incorrect. Nevertheless, Barnett argues that Lemon's failure

to make note, in the affidavit, that Welby had little experience with

the heat-imaging equipment was a material omission made intentionally

22

or with reckless disregard for the truth. Although the district court

made no direct finding on this issue, we need not pursue the matter as

the affidavit would have been sufficient without the challenged data.

"[I]f an affiant knowingly includes a false statement in a
warrant affidavit, the warrant will stand if, 'when material
that is the subject of the alleged falsity or reckless disre-
gard is set to one side, there remains sufficient content in
the warrant affidavit to support a finding of probable
cause.'"

United States v. Veillette, 778 F.2d 899, 904 (1st Cir. 1985), cert.

denied, 476 U.S. 1115 (1986) (quoting Franks, 438 U.S. at 171-72).

The Fourth Amendment warrant requirement is met if the magistrate

had a "'substantial basis for . . . conclud[ing]' that a search would

uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 236

(1983) (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

Without regard to the incorrect heat-imaging data, the Lemon affidavit

established probable cause to search the trailer.11 The suppression

11We summarize some of the more salient information in the affi-
davit:
(1) In March 1990, a cooperating individual informed Lemon that
Barry Jordan and a man known as "Barney" were manufacturing metham-
phetamine in the South Shore area, possibly in Scituate. According to
the informant, Jordan and "Barney" manufactured ten pounds of metham-
phetamine in November or December of 1989.
(2) Jordan told DEA undercover agent Kelly that he and his
chemist had 160 pounds of chemicals, and needed only hydriodic acid to
manufacture forty pounds of methamphetamine. Kelly supplied the
hydriodic acid in exchange for Jordan's promise to give Kelly four
ounces of methamphetamine.
(3) Clandestine methamphetamine labs typically have air vents or
ducts to dissipate toxic fumes; photographs of the trailer revealed a
"black bordered area" which Lemon, based on his experience, believed

23

ruling was not clearly erroneous.

C. Severance

Next, Barnett claims that denial of his severance motion violated

his Sixth Amendment right to confrontation, as a consequence of the

prejudice occasioned by the admission in evidence, at the joint trial,

of codefendant Fitzgerald's post-arrest statements, see Bruton v.

United States, 391 U.S. 123 (1968), and that he was further prejudiced

by the testimony of Fitzgerald's spouse, Sheryl.

At trial, Agent Lemon testified as follows:

I advised Mr. Fitzgerald that we had done a search on the
trailer in his backyard. I advised Mr. Fitzgerald that we
had found a speed lab, a methamphetamine lab. I told him
that I believed another person was the chemist, and I also
told Mr. Fitzgerald that I believed he knew who the other
person was and that this other person was a chemist . . . .
He told me he knew who this other person was, but that he did
not know that this person was involved with a clandestine
laboratory. He stated that he knew him or this other person
socially and that he would go out on occasion and have a few
drinks with this other person. . . . Mr. Fitzgerald told me
that he rented the trailer out to this other person and that
it was used for construction. . . . Mr. Fitzgerald told me
that he . . . did not know what was going on out in the

to be a trapdoor or venting area for a clandestine laboratory inside
the trailer.
(4) The pattern of electricity consumption suggested the pres-
ence of a clandestine lab. The electricity bills showed a dramatic
increase in December 1989, the time period during which Jordan and
"Barney" manufactured ten pounds of methamphetamine.
(5) During a DEA flyover on May 26, 1990, a DEA agent first
observed a power cord running between the trailer and the main house.
During a May 28 flyover, two Massachusetts State Troopers observed the
same cord.
(6) A DEA agent observed Barnett mixing and straining a "yellow,
slushy mixture" at the trailer on May 30.
(7) The trailer was located in a remote, wooded location, an
ideal site for a clandestine laboratory.

24

Barnett objected and moved to strike on Bruton grounds.12 The court

trailer, and I then asked Mr. Fitzgerald how he could explain

what Mr. Fitzgerald told me was that he was in the trailer,
the hydrio[d]ic acid label that was found in his coat, and

he saw the bottles of hydrio[d]ic acid, and that he removed
one of the labels because he wanted to find out what it was.

Lemon's testimony relating his own extrajudicial statements to Fitz-

25
13Although Barnett moved to strike the "entire conversation," he
did so on Bruton grounds only. No separate objection was made to

given.
against Fitzgerald. No limiting instruction was requested, offered or

Fitzgerald about "the chemist," no Bruton problem was presented and no

the Lemon testimony related the extrajudicial statements Lemon made to

There was no confrontation clause violation. First, insofar as

12At sidebar, the following exchange occurred:

hearsay objection was made.13 Even Fitzgerald's extrajudicial state-

sustained the Barnett objection, but allowed the testimony to stand

T H E C O U R T :

MR. HORAN:I would still contend that all along [for Barnett]:
the statement was sanitized so to speak, but the implication

MR. KENDALL:He will. What the Government would [AUSA]
is still clear by the Government that the person who is being

confessing to anything" and was a mere "fact witness" is reversible
anything. He's a fact witness.
T H E C O U R T :
talked about here is Michael Barnett.

Let's assume it is. He [Fitzgerald] is not confessing to

nett, or, conversely, it is only to Fitzgerald.

Barnett contends that the court's comment that Fitzgerald "was not
agree to is the statement will not be admitted against Bar-
How is this based under the Bruton issue?

error. This argument is baseless.
ments to Lemon neither identified nor inculpated Barnett, but merely

related factual observations established by other independent evi-

dence. Second, assuming the jury did deduce, as seems likely, that

Lemon and Fitzgerald were referring to Barnett, Fitzgerald's state-

ments nonetheless did not entail the sort of "'powerfully incriminat-

ing' effect of one accomplice pointing the finger directly at another,

without subjecting himself to cross-examination." United States v.

DiGregorio, 605 F.2d 1184, 1190 (1st Cir.), cert. denied, 444 U.S. 937

(1979), and cert. denied, 444 U.S. 944 (1979), and cert. denied, 444

U.S. 983 (1979) (quoting Bruton, 391 U.S. at 135). See also United

States v. Greenleaf, 692 F.2d 182, 188-89 (1st Cir. 1982), cert.

denied, 460 U.S. 1069 (1983) (finding no Bruton violation where

codefendant's statement was not "powerfully incriminating."). Not

only did Fitzgerald not confess guilt, he in no manner admitted to

knowledge of Barnett's guilt. Thus, Fitzgerald's admissions to Lemon

inculpated neither Barnett nor Fitzgerald.14

gerald in the guise of reciting Lemon's investigative efforts.

14Whatever prejudice might otherwise have resulted from the joint
trial was minimized by precautions the district court took to forfend
against it. After the pretrial severance motion was denied, the
government stipulated that any testimony relating post-arrest state-
ments by Fitzgerald would not refer to Barnett by name and the dis-
trict court firmly admonished against "any mention of [Barnett]" in
connection with Fitzgerald's statements.
Barnett nevertheless maintains that the court committed revers-
ible error by failing to instruct the jury that Fitzgerald's extraju-
dicial statements were not admissible against Barnett, even though
Barnett did not request a limiting instruction, either at the time of
the ruling or at the time of the final jury charge, and even though he
did not object to the charge. The claim must be deemed waived, United

States v. Mateos-Sanchez, 864 F.2d 232, 238 (1st Cir. 1988); United

26

Barnett submits that severance was warranted, nonetheless, to

avoid the cumulative prejudice from Fitzgerald's extrajudicial state-

ments and the testimony of Sheryl Fitzgerald.15 The severance

ruling is reviewable for abuse of discretion, reversible only if it

"'deprived defendant of a fair trial, resulting in a miscarriage of

justice.'" United States v. Tejeda, 974 F.2d 210, 219 (1st Cir. 1992)

(quoting United States v. McLaughlin, 957 F.2d 12, 18 (1st Cir.

1992)); see also United States v. Martinez, 922 F.2d 914, 922 (1st

Cir. 1991) (severance is committed to the sound discretion of the

trial judge, reversible only on a showing of manifest abuse). While

incidental prejudice is sometimes unavoidable in a joint trial, only a

States v. Rawwad, 807 F.2d 294, 296 (1st Cir. 1986), cert. denied, 482

U.S. 909 (1987), especially since it seems highly likely that the
trial court would have viewed it as a reasonable tactical decision for
defense counsel to refrain from requesting an instruction recalling
the jury's attention to Lemon's testimony. "We have been extremely
reluctant 'to increase the heavy burdens already imposed on trial
judges in criminal cases' by mandating that the district courts act
sua sponte to override seemingly plausible strategic choices on the

part of counselled defendants." United States v. De La Cruz, 902 F.2d

121, 124 (1st Cir. 1990) (quoting United States v. Reveron Martinez,

836 F.2d 684, 687 (1st Cir. 1988)). Furthermore, we are confident
that there was no plain error. The absence of a limiting instruction
did not "seriously affect the fundamental fairness and basic integrity
of the proceedings," United States v. Griffin, 818 F.2d 97, 100 (1st

Cir.), cert. denied, 484 U.S. 844 (1987).

15Barnett identifies two aspects of Sheryl Fitzgerald's testimony
as especially prejudicial: (1) that Barnett entered the Fitzgerald
house several times on May 30, leaving with clear plastic sandwich
bags in his possession on one occasion; and (2) that, after Barnett
left on the evening of May 30, she found a piece of paper bearing
handwriting different than her husband's, and gave it to her husband
to deliver to Barnett. Barnett does not mention, in this connection,
some of Sheryl Fitzgerald's other testimony. For example, she testi-
fied that she rented the trailer to Barnett.

27

strong showing of substantial prejudice will warrant reversal.

McLaughlin, 957 F.2d at 18.

The "heavy burden" of demonstrating the unfair prejudice required

for reversal has not been met. See United States v. Perkins, 926 F.2d

1271, 1280 (1st Cir. 1991). First, the record does not disclose that

this issue was preserved at trial, as Barnett neither objected to

Sheryl Fitzgerald's testimony, nor requested a limiting or cautionary

instruction. Second, Barnett identifies no basis for excluding her

testimony, either at a joint trial or a separate trial. Thus, al-

though her testimony inculpated Barnett, there was no unfair preju-

dice.

D. Criminal Rule 35

Barnett appeals from the dismissal of his motion to correct

sentence pursuant to Fed. R. Crim. P. 35(a), which sought a downward

departure due to diminished mental capacity.16 The district court

16Barnett claims that he suffers from short-term memory loss.
Mental and emotional conditions generally are not grounds for downward
departure. U.S.S.G. 5H1.3. See United States v. Lauzon, 938 F.2d

326, 333 (1st Cir.), cert. denied, U.S. , 112 U.S. 450 (1991);

United States v. Studley, 907 F.2d 254, 257 (1st Cir. 1990). Never-

theless, a guideline policy statement provides as follows:

If the defendant committed a non-violent offense while suf-
fering from significantly reduced mental capacity not result-
ing from voluntary use of drugs or other intoxicants, a lower
sentence may be warranted to reflect the extent to which
reduced mental capacity contributed to the commission of the
offense, provided that the defendant's criminal history does
not indicate a need for incarceration to protect the public.

U.S.S.G. 5K2.13.

28

dismissed on the ground that it lacked the power to grant relief under

Rule 35(a).

Rule 35(a)17 expressly empowers a district court to correct a

sentence only on remand from the court of appeals. United States v.

Carr, 932 F.2d 67, 69 (1st Cir.), cert. denied, U.S. , 112 S.

Ct. 112 (1991). Rule 35(c), which permits the sentencing court to

correct a sentence imposed as a result of arithmetical, technical, or

other clear error, was not in effect either when the Barnett motion

was filed or dismissed. Moreover, in this case we need not consider

whether the district court had the inherent power to correct obvious

sentencing errors, see United States v. Rico, 902 F.2d 1065, 1067-68

(2d Cir.), cert. denied, U.S. , 111 S. Ct. 352 (1990); United

States v. Cook, 890 F.2d 672, 674-75 (4th Cir. 1989); see also Carr,

932 F.2d at 70-71, since there were none. As the sentence imposed on

Barnett was in no respect unlawful or unreasonable, the motion to

reconsider was properly dismissed.

17Federal Rule of Criminal Procedure 35(a) provides:

The court shall correct a sentence that is determined on

appeal under 18 U.S.C. 3742 to have been imposed in violation

of law, to have been imposed as a result of an incorrect
application of the sentencing guidelines, or to be un-
reasonable, upon remand of the case to the court

(1) for imposition of a sentence in accord with the findings
of the court of appeals; or
(2) for further sentencing proceedings if, after such pro-
ceedings, the court determines that the original sentence was
incorrect.

Fed. R. Crim. P. 35(a) (emphasis added).

29

E. Outrageous Government Conduct

Barnett claims that the indictment should have been dismissed on

due process grounds, since Agent Kelly's sale of hydriodic acid to

Jordan constituted outrageous government conduct. Law enforcement

conduct violates the Due Process Clause of the Fifth Amendment if it

results in a denial of "'fundamental fairness, shocking to the univer-

sal sense of justice.'" United States v. Russell, 411 U.S. 423, 432

(1973) (quoting Kinsella v. United States ex rel. Singleton, 361 U.S.

234, 246 (1960)). See also United States v. Panitz, 907 F.2d 1267,

1272 (1st Cir. 1990) ("The Supreme Court has not foreclosed the pos-

sibility that the government's active participation in a criminal

venture may be of so shocking a nature as to violate a defendant's

right to due process, notwithstanding the defendant's predisposition

to commit the crime"). We find no due process violation.

Because drug conspiracies are notoriously difficult to penetrate,

courts consistently have allowed greater government involvement in

drug-crime investigations. Panitz, 907 F.2d at 1273. Law enforcement

infiltration of drug rings, and even limited investigative participa-

tion in their unlawful operations, do not constitute outrageous

government conduct violative of due process. Russell, 411 U.S. at

432.

Although Agent Kelly sold Jordan a precursor chemical which is an

integral methamphetamine component, the government was neither the

conspirators' sole source (hydriodic acid obtained from other sources

was seized in the warehouse search), nor did the government initiate

30

the criminal conduct. Jordan told Agent Kelly that Barnett had been

producing methamphetamine for ten years. Other evidence revealed that

Jordan and Barnett had manufactured eight to ten pounds of metham-

phetamine in 1989. The sale of hydriodic acid to Jordan in these

circumstances was a permissible investigative effort to infiltrate the

suspected drug-related conspiracy. The district court properly denied

the motion to dismiss on due process grounds.

F. Cumulative Error

Finally, as most assignments of error were baseless, we reject

Barnett's contention that the cumulative effect of the many errors he

alleges required reversal on due process grounds. We are well satis-

fied that Barnett received due process: "[T]he Constitution entitles

a criminal defendant to a fair trial, not a perfect one." Delaware v.

Van Arsdall, 475 U.S. 673, 681 (1986).

The sentence of appellant Jordan and the conviction and sentence

of appellant Barnett are affirmed.

31